**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

J2 SEP 13 PM 3: 4 !

U. ..................... .RT
N.D. OF ALABAMA

*ke*

| | | |
|---|---|---|
| LESLIE-ANN WARNER-ENO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-01-S-1683-NE |
| | ) | |
| DELPHI AUTOMOTIVE SYSTEMS, | ) | |
| L.L.C., and UNITED AUTOMOBILE, | ) | |
| AEROSPACE, & AGRICULTURAL | ) | |
| IMPLEMENT WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**

SEP 1 3 2002

**MEMORANDUM OPINION**

Plaintiff, Leslie Ann Warner-Eno, alleges that her employer, Delphi Automotive Systems, L.L.C. ("Delphi"), subjected her to gender discrimination and a hostile work environment, and then retaliated against her in response to her complaints of such discrimination. She also alleges that her trade union, the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), subjected her to discrimination. All of plaintiff's claims are based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The case presently is before the court on defendants' motions for summary judgment. Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendants' motions are due to be granted.[1]

---

[1]Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

*54*

# I. INTRODUCTION

If this case is not frivolous and vexatious, it certainly borders on being such. This court agrees with the assertion of defendant Dephi that plaintiff has attempted to "transform a series of mundane workplace events" into a federal case.[2] Plaintiff has not established that she was subjected to "adverse" employment actions, nor has she demonstrated that the trivial and widely-spaced acts of alleged "harassment" were either severe or pervasive. This court could have disposed of the motions for summary judgment simply by adopting the defendants' briefs as the opinion of this court, but ultimately decided not to do so. The court instead indulges the parties with an extended discussion of the questionable merits of plaintiff's claims.

# II. SUMMARY OF FACTS

## A.    Facts Pertinent to Plaintiff's Claims Against Delphi

Plaintiff has worked at Delphi's Athens, Alabama, plant since 1984.[3]   Except for a brief period during which she worked as a so-called "per-diem supervisor," plaintiff has been an hourly-wage production employee and a member of the UAW.[4]   In the early-to-mid 1990's, she began

---

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

[2]Dephi's brief in support of summary judgment (doc. no. 34), at 1.

[3]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 37.

[4]*Id.* at 38, 203, 215, 219-220; Complaint ¶ 4.

working in Department 92 of the Delphi plant[5] as a "floater"[6] — that is, a person who works various positions along the production line, replacing absent employees.[7]  Plaintiff alleges that she was subjected to disparate treatment based upon her gender on numerous occasions.[8]

Sometime between 1995 and 1996 — many of the dates of pertinent events are similarly indefinite in the pleadings and record submitted to this court — plaintiff was denied a "material handler" job by her supervisor, Dick Bremer.[9]  A material handler is an individual who is responsible for moving parts and supplies from one work station on the production line to the next.[10] Plaintiff asserts that this position was impermissibly awarded to a male employee, Mike Widner, because, under the terms of the union's collective bargaining agreement with Delphi, she was entitled to the job due to her seniority.[11]  Plaintiff complained to her union committeeman, Greg DeMike.[12]  Plaintiff claims that, as a result, Bremer thereafter moved her around to different positions.[13]  Although all Delphi employees were moved to different jobs from time-to-time, plaintiff believed that Bremer was moving her "because [she] was trying to pursue . . . a job that [Bremer] didn't want [her] to have."[14]  Plaintiff later sought, and received, a transfer to the day shift.[15]  Two

---

[5]Department 92 consists of a production line that manufactures devices called T.C. pumps. Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 47.  Gregory DeMike explained that "T.C. stands for transverse compact power steering pump . . . and was a power steering pump that would power assist your steering gear in your car."  *Id.* at Exhibit E (DeMike deposition), at 53.

[6]*Id.* at Exhibit A (Warner-Eno deposition), at 38.

[7]*Id.* at Exhibit B (Mitchell deposition), at 52.

[8]*Id.* at Exhibit A (Warner-Eno deposition), at 51-52.

[9]*Id.* at 99-100.

[10]*Id.* at 37.

[11]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 103-04.

[12]*Id.* at 100.

[13]*Id.* at 100-01.

[14]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 102.

[15]*Id.* at 100.

to three weeks after plaintiff's transfer to the day shift, the material handler position was awarded to another female employee, Willa Booker.[16]  Plaintiff either does not know, or did not inform this court, where Widner was eventually placed.[17]  Further, plaintiff does not define the differences in pay and other job conditions (if any) between the material handler position she sought and the floater job position she held.

About two years after the foregoing events (as best this court can ascertain, sometime in 1998), and while plaintiff was working weekend overtime, she temporarily came under Bremer's supervision.[18]  Plaintiff claims that Bremer removed her from the position she normally worked, and replaced her with another employee for that day.[19]  Plaintiff complained to her UAW committeeman (DeMike), who filed a grievance on her behalf, asserting that Bremer's action violated the overtime provisions of the collective bargaining agreement.[20]  The evidence indicates that plaintiff was replaced that day by a female co-employee, Evelyn Pace.[21]  Plaintiff later was informed by DeMike that Pace, rather than plaintiff, was entitled to work the overtime shift that day, as set forth in the terms of the collective bargaining agreement.[22]  Even so, plaintiff asserts that while she was discussing the overtime situation with DeMike, Bremer twice interrupted the discussion, and told plaintiff that any time she spent talking to DeMike would be counted  against her breaks and lunch

---

[16]*Id.* at 104-05.

[17]*Id.* at 105.

[18]*Id.* at 107.

[19]*Id.*

[20]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 107-08.

[21] Delphi's evidentiary submissions, Exhibit E (DeMike deposition), at 152-54.

[22]At the Delphi's facility, employees were separated into overtime equalization groups for purposes of determining which employee was entitled to work an overtime shift first.  The amount of overtime offered and worked by each employee was calculated on a weekly basis.  When management needed a an employee to work overtime at a particular position, the overtime was offered first to the person in that overtime equalization group with the fewest overtime hours, next to the employee with the second lowest overtime hours, and so forth.  Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 91, 95-96; Exhibit A (Warner-Eno deposition), at 108.

time.[23] DeMike and Bremer subsequently argued this point.[24] Although the date of the foregoing event is unclear, plaintiff filed a union grievance alleging that Bremer had harassed her.[25]

In April of 1999, plaintiff began working under the supervision of Marshall "Mitch" Mitchell, an hourly-wage employee who was temporarily serving as a per-diem supervisor in Department 92.[26] Plaintiff asserts that Mitchell harassed her on the basis of her gender by assigning her to jobs that she did not desire to perform.[27] For example, Mitchell assigned a less senior employee to the fitting machine, and plaintiff to the assembly line.[28] Although both jobs paid the same amount, plaintiff preferred the fitting machine job, and claims that, as the most senior floater, she should have been permitted first choice among available positions.[29] Plaintiff again complained to DeMike, who discussed the matter with Mitchell.[30] Plaintiff then was reassigned to the fitting machine, as she had requested.[31]

On another occasion, Mitchell directed plaintiff to install "O-rings" for two or three weeks.[32] Normally, employees working as floaters in Department 92 (such as plaintiff) were assigned the task of installing O-rings only when they were not on the production line, relieving another employee.[33] Mitchell admitted that he ignored this practice when sufficient quantities of O-rings were on-hand

---

[23] Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 129-30.

[24]*Id.*

[25]*Id.* at 244-50.

[26]Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 14-15.

[27]Complaint ¶ 18(d).

[28]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 56.

[29]*Id.*

[30]*Id.* at 57-58.

[31]*Id.* at 58.

[32]*Id.* at 134.

[33]Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 53-54.

and ready for installation.[34]   Installation of O-rings is a relatively simple task (rubber rings are placed on metal plates).[35]   Plaintiff concedes that, despite the simplicity of the task, there is nothing inherently demeaning about the job of installing O-rings.[36]

In sum, plaintiff asserts that, as the floater with the most seniority, she should have been accorded her choice of available jobs, in accordance with the prevailing practice of the plant; and that Mitchell's assignment of her to tasks without regard to her seniority constituted harassment and discrimination on the basis of her gender.[37]   The collective bargaining agreement does not address the order in which floaters (such as plaintiff) are to be assigned to tasks, however.[38]   Supervisors are generally understood to have the authority to assign floaters as they see fit.[39]   Although plaintiff argues that she may choose which job she wants to perform due to her seniority, Delphi elaborates on the policy by explaining that, once all floaters with less seniority than plaintiff have been assigned, plaintiff may be assigned to the next open position, regardless of her preferences.[40]

In 1999, Plaintiff lodged complaints about Mitchell with two of his superiors, Mark McClanahan and Robert Andress.[41]   Two weeks after plaintiff's initial meeting with Andress, a larger meeting was held, which was attended by plaintiff, Andress, Mitchell, plaintiff's union zone representative Tim Letson, local union chairman Joe Lovorn, and Danny Gorree, who was Mitchell's current supervisor.[42]   During the meeting, Mitchell stated that plaintiff would only work

---

[34]*Id.*

[35]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 7.

[36]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 134-35.

[37]*Id.*

[38]*Id.* at 135-36.

[39]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 8.

[40]*Id.*

[41]*Id.* at 66-67.

[42]*Id.* at 71-72.

at jobs she preferred, and she had screamed at him.[43]  Plaintiff denies that she screamed at Mitchell.[44]

Plaintiff further claims that when she discussed her objections to Mitchell's assignments, Mitchell

told her that she needed to "stay in [her] place," and that Mitchell complained about her frequent

calls to her union committeeman.[45]

Plaintiff claims that she was again harassed in 1999, when she was not awarded a "job setter"

position.[46]   A job setter prepares machinery, and sets up equipment and parts, for jobs to be

performed on a particular assembly line or at a particular work station.[47]  In accordance with the

collective bargaining agreement, the job setter position was awarded to Robert Anders, an employee

with more seniority than plaintiff.[48]  Plaintiff nonetheless claims that she was denied the position

based upon her gender.[49]  To support her contention, plaintiff alleges that Anders told her, after he

vacated the position in October 1999, that area manager Tommy Jones had told him to apply for the

job setter position, because Jones was going to hold it open for him, and that Anders would be

awarded the position because of his seniority.[50]  The implication is that area manager Jones did not

want plaintiff to be awarded the position, but she again has failed to inform this court of the

differences in the compensation, terms, or other material conditions (if any) of the position she then

held and the one she sought.

Plaintiff further alleges that Mitchell harassed her based upon her gender by telling her to

---

[43]*Id.* at 72.

[44]*Id.*

[45]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 132-33.

[46]Complaint ¶ 31.

[47]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 9.

[48]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 92-93; Delphi's evidentiary submissions, Exhibit C (Jones deposition), at 13-14.

[49]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 92-93, 95.

[50]*Id.*

remove from the shop area a metal cabinet, which she used as a locker instead of the standard, smaller locker used by most employees.[51]  Plaintiff and some other employees had appropriated unused cabinets and other storage containers for use as lockers.[52]  Plaintiff admits that at least one other employee had complained about her use of the larger cabinet as a locker.[53]  Upon receiving an order from his supervisor to clean up the department, Mitchell ordered that all non-standard lockers be cleaned out and removed.[54]  Upon being told that she would have to give up her cabinet, plaintiff complained to area production manager Kerry Wright, who was one level of supervision above Mitchell.[55]  Plaintiff was told that she could not keep her filing cabinet/locker, but was given additional time to remove it.[56]  Plaintiff did not comply with these instructions, however.  Moreover, Delphi did not enforce them.  Consequently, plaintiff was allowed to retain her non-standard filing cabinet/locker, even though other employees were ultimately required to remove theirs from the workplace.[57]

Plaintiff also complains of Mitchell telling her not to read personal materials while "on the clock."[58]  Plaintiff was attending college during 1999, and read text books while tending a self-feeding machine.[59]  Mitchell claims that, while he permitted employees to read briefly during lulls in the work day, both he and plaintiff's co-workers objected to her reading for hours at a time, or

---

[51]*Id.* at 78-79.

[52]*Id.* at 79.

[53]*Id.*

[54]Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 67-69, 73-75.

[55]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 82.

[56]Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 78.

[57]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 80, 83-84.

[58]*Id.* at 114-16.

[59]*Id.* at 109-10, 114-16.

when the department was low on O-rings.[60]  Plaintiff alleges that Mitchell asked her not to read on

three occasions.[61]  Plaintiff stated that she currently reads during normal work hours "any time [she]

get[s] ready as long as [she's] performing [her] job."[62]  Plaintiff testified that other employees read

on the job, and Mitchell also told them not to do so.[63]  Like her, the other employees continued to

read.[64]  Neither plaintiff nor any other employee was disciplined for reading on the job.[65]  Plaintiff

claims that supervisors instructed employees not to read on the job "for harassment."[66]

Plaintiff claims that Mitchell harassed her by not offering her the opportunity to work

overtime on several weekends.[67]  While plaintiff was under Mitchell's supervision, she filed four

grievances alleging that management had failed to comply with the overtime allocation rules set

forth in paragraph 71 of the local collective bargaining agreement.[68]  Those grievances were filed

on April 22, April 26, May 5, and October 4, 1999.[69]  Plaintiff alleged in each grievance that a male

employee was given the overtime opportunity that she was due.[70]  Delphi's records indicate,

however, that another female employee, Glenda Gober, was given the disputed overtime on at least

one such occasion.[71]  Delphi initially denied all four of plaintiff's overtime grievances, on the ground

that plaintiff was not entitled to the disputed assignments under the overtime equalization rules.[72]

---

[60]Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 45-47.

[61]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 115, 147.

[62]*Id.* at 146.

[63]*Id.* at 150.

[64]*Id.*

[65]*Id.* at 148-50.

[66]*Id.* at 150.

[67]Complaint (doc. no. 1) ¶ 19.

[68]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 5.

[69]*Id.*

[70]Complaint ¶ 19.

[71]Delphi's evidentiary submissions, Exhibit E (DeMike deposition), at 101.

[72]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 5.

Each of the grievances was later settled in compromises between UAW and Delphi, however, resulting in plaintiff being paid for all four disputed overtime instances, despite the fact that she did not actually work the hours.[73]

In late 1999, Mitchell was moved to a different department.[74]  Even so, plaintiff complains that, while Mitchell was filling in for an absent Department 92 supervisor one Saturday (November 20, 1999), he "harassed" her, by assigning her to the "heat treat" job for the day.[75]  Plaintiff asserts that she had been assigned to the material handler job on the fitting machine for several weeks, and claims that she should have been permitted to work in that position on the day that Mitchell assigned her to the "heat treat" job.[76]  Notably, the pay for working as a material handler or in "heat treat" is the same.[77]  Mitchell claims that, in accordance with the terms of the collective bargaining agreement, he placed another employee, Steve Pennington, in the material handler position for the day because Pennington was lower in overtime hours than plaintiff.[78]  Plaintiff concedes that the employee with lower overtime hours was entitled to the position, but nonetheless claims that she should not have been moved because, according to plaintiff, there was a position available on the fork truck for the "low" employee that day.[79]  Plaintiff complained to her committeeman (DeMike), and was offered a choice between working in heat treat or going home.[80]  Plaintiff chose to go home.[81]

---

[73]*Id.*

[74]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 58-59.

[75]*Id.* at 59-60.

[76]*Id.*

[77]*Id.* at 87.

[78]Delphi's evidentiary submissions, Exhibit B (Mitchell deposition), at 112-16.

[79]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 63.

[80]*Id.* at 61.

[81]*Id.* at 29-30.

Plaintiff filed an EEOC charge on February 1, 2000, which she amended on March 17, 2000, alleging discrimination and retaliation by Delphi.[82]  Plaintiff subsequently filed this lawsuit on July 3, 2001.

## B.      Facts Pertinent to Plaintiff's Claims Against UAW

Plaintiff estimates that, during her eighteen-year career with Delphi, she lodged approximately twenty grievances through the UAW.[83]  Plaintiff's claim here is based upon the UAW's failure to file a solitary grievance in or about November 1999,[84] when plaintiff approached her union committeeman, Greg DeMike, about filing a grievance concerning plaintiff's perception of unfair treatment by her then-supervisor, Marshall Mitchell, in the assignment of overtime.[85] Plaintiff asked that the grievance be based upon paragraph 6(a) of the collective bargaining agreement, which provides in pertinent part:

> It is the policy of Delphi Automotive Systems and the UAW that the provisions of this Agreement be applied to all employees covered by this Agreement without discrimination based on age, race, color, sex, religion, national origin, disability or sexual orientation as required by appropriate state and federal law.  Any claims of violation of this policy, claims of sexual harassment or of any laws regarding discrimination or harassment on account of disability may be taken up as a grievance.[86]

DeMike demurred, saying that he wanted to investigate plaintiff's claim, and independently determine whether a grievance was warranted.[87]

---

[82]Delphi's evidentiary submissions, Exhibit A (Plaintiff's EEOC charge), at 1; Exhibit B (Marshall deposition), at 20-22.  The parties did not include the original EEOC charge in their evidentiary submissions; thus, the court only has the March 17, 2000 EEOC charge for reference.

[83]Dephi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 233.

[84]Complaint, at Count II.

[85]UAW's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 277-78.

[86]Delphi's evidentiary submissions, Tab 1 (Delphi-UAW collective bargaining agreement (dated September 28, 1999)), at 12.

[87]UAW's evidentiary submissions, Exhibit B (DeMike deposition), at 120, 136-37.

DeMike reviewed the overtime equalization charts for plaintiff's group, as well as plaintiff's prior grievances regarding overtime.  DeMike concluded that, on at least one occasion, plaintiff's overtime was given to another female employee (Glenda Gober), and that fact, in his opinion, undermined a gender discrimination claim.[88]  DeMike concluded, nevertheless, that Delphi was incorrectly applying the overtime provisions of the collective bargaining agreement.[89]  He therefore advised plaintiff that she should file an overtime grievance based upon paragraph 71 of the collective bargaining agreement,[90] providing that:

> Extra work in periods of part-time operation, and overtime, should be equalized among the employees in the group engaged in similar work, as far as practicable. Information concerning equalization of hours status will be openly displayed in the department in such a manner that the employees involved may check their standing. This provision shall not interfere with any mutually satisfactory local practice now in effect.[91]

DeMike told plaintiff that, if she allowed him to base her grievance upon paragraph 71, she probably would be compensated for the disputed overtime.[92]  Plaintiff disagreed with DeMike's assessment,[93] and he accordingly advised her to contact Al Rainey, the chairman of the Local 2195 Civil Rights Committee.[94]  DeMike also conferred with Rainey, and they concurred in the opinion that the proper basis for plaintiff's grievance was paragraph 71, not paragraph 6(a), of the collective bargaining agreement.[95]  DeMike informed plaintiff of Rainey's decision, and again requested that plaintiff

---

[88]*Id.* at 136-37, 146.

[89]*Id.* at 136-37.

[90]*Id.* at 115-16.

[91]Delphi's evidentiary submissions, Tab 2 (Agreement between General Motors and the UAW (dated November 2, 1996)), at 54-55.

[92]UAW's evidentiary submissions, Exhibit B (DeMike deposition), at 114.

[93]*Id.*

[94]*Id.*

[95]*Id.*

allow him to file a paragraph 71 grievance on her behalf.[96] Plaintiff again insisted on filing a paragraph 6(a) grievance, so DeMike referred her to Zone Committeeperson Tim Letson.

Plaintiff also met with Rainey, who advised her that if she wanted to contest DeMike's decision, she could file a complaint against DeMike with the local civil rights committee of the union. Rainey showed plaintiff the book describing the procedures necessary to file a complaint against DeMike.[97] Plaintiff also complained to various other people in the union hierarchy, all of whom agreed that plaintiff's complaint was properly characterized as an overtime dispute, and not a discrimination claim.[98]

Plaintiff admits that the foregoing incident is the only instance in which she has complained about DeMike's representation of her.[99] Plaintiff does not claim that UAW failed to write or pursue a grievance on any other occasion.

### III. DISCUSSION

A.   **Plaintiff's Title VII Claims Against Delphi**

1.     **Administrative prerequisites**

a.     **Sufficiency of plaintiff's EEOC charge**

Plaintiff filed her original EEOC charge on February 1, 2000, but amended that charge on March 17, 2000.[100] The parties did not submit a copy of the original charge, however, and the court accordingly has only the amended charge for reference. The March 17, 2000 charge is problematic, in that the boxes checked on the form indicate that plaintiff's claims were for racial discrimination

---

[96]*Id.* at 114-15.

[97]UAW's evidentiary submissions, Exhibit A (Warner-Eno deposition) at 280-82.

[98]*Id.* at 290-91.

[99]*Id.* at 325-26.

[100]Delphi's motion in support of summary judgment, at 13.

and retaliation alone, as opposed to discrimination on the basis of sex, which is the sole foundation

for her judicial complaint. Even so, a statement attached to the amended charge asserts that Delphi's

conduct

> as cited above, has created a hostile work environment for the Complainant based
> upon her gender (female) as well as discriminating against the Complainant on the
> basis of her gender (female) regarding the terms and conditions of her employment.
> Further, the Respondent has retaliated against the Complainant in the terms and
> conditions of her employment by harassing her and denying her overtime work and
> denying her access to complaint procedures in retaliation for making previous
> complaints of gender discrimination and harassment.[101]

As a general rule, a Title VII plaintiff cannot state claims in a judicial complaint that were not

included in his or her EEOC charge. *See, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332

(11th Cir. 2000) ("The starting point of ascertaining the permissible scope of a judicial complaint

alleging employment discrimination is the administrative charge and investigation."). A gloss was

added to this rule by the former Fifth Circuit in *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th

Cir. 1970),[102] where the court held that the "scope" of a plaintiff's judicial complaint "is limited by

the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge

of discrimination." *Id.* at 466; *see also Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th

Cir. 1994).

Here, plaintiff's attached statement clearly prefigures the nature of her later lawsuit, and this

court holds that plaintiff's error in checking the incorrect box on her EEOC charge does not

adversely affect her gender-based claims, which are unambiguously spelled out in the attached

statement, thus giving defendants appropriate notice regarding the true nature of her claims.

---

[101]Dephi's evidentiary submissions, Exhibit A (Plaintiff's amended EEOC charge).

[102]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

b.    **Timely filing**

A Title VII plaintiff generally must submit a charge of discrimination to the Equal

Employment Opportunity Commission within 180 days "after the alleged unlawful employment

practice occurred." 42 U.S.C. § 2000e-5(e)(1).

> Before a potential plaintiff may sue for discrimination under Title VII, she
> must first exhaust her administrative remedies. *See Crawford v. Babbitt*, 186 F.3d
> 1322, 1326 (11th Cir.1999). The first step down this path is filing a charge
> of discrimination with the EEOC. See 42 U.S.C. § 2000e-5(b) (1994); *Alexander v.*
> *Fulton County*, 207 F.3d 1303, 1332 (11th Cir.2000). For a charge to be timely in
> a non-deferral state such as Georgia [or Alabama], it must be filed within 180 days
> of the last discriminatory act. *See* 42 U.S.C. § 2000e-5(e)(1) (1994); *Howlett v.*
> *Holiday Inns, Inc.*, 49 F.3d 189, 197 (6th Cir.1995).

*Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001); *see also, e.g.*, *United Air Lines,*

*Inc. v. Evans,* 431 U.S. 553, 555 n.4, 97 S.Ct. 1885, 1887 n.4, 52 L.Ed.2d 571 (1977) ("Timely filing

is a prerequisite to the maintenance of a Title VII action.") (citation omitted); *see also, e.g.,*

*Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation

of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-

filed EEOC charge.").

If a plaintiff fails to file a charge within this 180-day period, his or her claims may be

procedurally barred for untimeliness. *See Delaware State College v. Ricks*, 449 U.S. 250, 256, 101

S.Ct. 498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County School District*, 138 F.3d 1407, 1410

(11th Cir. 1998). The Supreme Court has held that "filing a timely charge of discrimination with

the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a

statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World*

*Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) (footnote omitted). Once

the issue is raised by a defendant, however, it is the plaintiff who bears the burden of proving that

-15-

the administrative prerequisite was satisfied.

> [A] plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled." If the defendant doubts the veracity of plaintiff's allegation, in whole or in part, then the defendant may deny "specifically and with particularity" that the preconditions have not been fulfilled. The plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied.

*Jackson v. Seaboard Coast Line Railroad Company*, 678 F.2d 992, 1010 (11th Cir. 1982) (quoting Fed.R.Civ.P. 9(c)) (other citations omitted).[103]

Here, Delphi "specifically and with particularity" denied that plaintiff's EEOC charge was timely. *See* Delphi's Answer (doc. no. 6), at 6 ("The plaintiff's claims under Title VII are barred to the extent that she failed to fulfill all requisite administrative conditions precedent to filing suit under Title VII, including but not limited to failing to file an EEOC charge within 180 days of the acts about which she complains and/or failing to raise claims in the EEOC charge."). UAW also denied plaintiff's compliance with the administrative filing requirements in substantially identical language. *See* UAW's Answer (doc. no. 8), at 7.

Plaintiff filed her original EEOC charge against Delphi on February 1, 2000.[104] Thus, plaintiff ordinarily can bring suit only on violations that occurred on or after August 5, 1999. *See* 42 U.S.C. § 2000e(5)(e)(1); *see also Delaware State College v. Ricks,* 449 U.S. 250, 256, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County Sch. Dist.,* 138 F.3d 1407, 1410 (11th Cir. 1998) (holding that if a plaintiff fails to file a charge within 180 days, his or her claim will be procedurally barred for untimeliness). The only incidents complained of by plaintiff that occurred

---

[103]The *Jackson* Court also observed that, "[i]f, however, the defendant does not deny the satisfaction of the preconditions specifically and with particularity, then the plaintiff's allegations are assumed admitted, and the defendant cannot later assert that a condition precedent has not been met." *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982) (citations omitted).

[104]Delphi's evidentiary submissions, Exhibit A (Plaintiff's EEOC charge), at 1.

498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1410 (11th Cir. 1998) (holding that if a plaintiff fails to file a charge within 180 days, his or her claim will be procedurally barred for untimeliness). The only incidents complained of by plaintiff that occurred after August 5, 1999 were these: plaintiff learned in October of 1999 that co-employee Robert Anders previously had been awarded a "job setter" position desired by plaintiff because area manager Tommy Jones "held it open" for him;[105] plaintiff was instructed by Mitchell on three occasions to stop reading "on the clock" (*i.e.*, when she was supposed to be working);[106] plaintiff filed an overtime grievance on October 4, 1999;[107] and plaintiff was assigned to "heat treat" duty on November 20, 1999.[108] Consequently, all previous Title VII violations complained of by plaintiff are due to be dismissed as untimely, unless plaintiff can demonstrate either that the discriminatory character of the tardy claims was not readily apparent on the date each underlying event occurred, or that the otherwise time-barred claims are substantially related to a timely-filed claim. *See, e.g., Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1531 (11th Cir. 1992) ("Precedent in this circuit and the former Fifth Circuit has established that the limitations period is tolled 'until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for [her] rights.'") (quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559 (11th Cir. 1987)); *Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793, 799-800 (11th Cir.) ("It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the

---

[105]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 92-93, 95.

[106]It is unclear when these events occurred. Here the court gives the plaintiff the benefit of the doubt because this court holds that the plaintiff's being told not to read on the clock is not any kind of violative act, as discussed *infra. Id.* at 114-16.

[107]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 5.

[108]Delphi's evidentiary submissions, Exhibit A (Plaintiff's EEOC charge), at 59-60.

limitations period."), *modified on reh'g*, 850 F.2d 1549 (11th Cir. 1988).

> **i.      Plaintiff's claims outside the 180-day administrative filing period**

One equitable exception to the 180-day filing requirement is the so-called "continuing violation doctrine." *See Berry*, 715 F.2d at 979. When an employer has engaged in a series of discriminatory acts, with at least one of the acts occurring within the 180-day filing window, then the plaintiff's claims *may* be considered timely to all of such acts. *See Roberts*, 835 F.2d at 799-800. At a minimum, the plaintiff must establish that at least one violation occurred within the 180-day filing window. *See Evans*, 431 U.S. at 558, 97 S.Ct. at 1887 ("[T]he critical question is whether any present violation exists."); *Coon v. Georgia-Pacific Corp.*, 829 F.2d 1563, 570 (continuing violation doctrine "relieves a plaintiff of the burden that all actionable conduct must have occurred within 180 days prior to the charge, so long as the complaint is timely as to the last occurrence"); *Lewis v. MacMillan-Bloedel, Inc.,* 670 F. Supp. 330, 335 (S.D. Ala. 1986) ("[A]n allegation of a continuing violation requires that there be in fact a *present violation* during the applicable 180-day time period.") (emphasis in original).

Further, the plaintiff must show that the time-barred acts and the current acts are related by a "substantial nexus."

> The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse. *It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period.*

*Roberts*, 835 F.2d at 800 (emphasis added).

A problem often arises in determining whether a plaintiff has carried the "burden of proving the existence of a substantial nexus between the acts." *Id.* (citing *Milton v. Weinberger*, 645 F.2d

-18-

1070, 1077 (D.C. Cir.1981)[109]). That is because "[c]ourts have not formulated a clear standard for determining when alleged discriminatory acts are related closely enough to constitute a continuing violation and when they are merely discrete, isolated, and completed acts which must be regarded as individual violations." *Berry v. Board of Supervisors*, 715 F.2d 971, 981 (5th Cir. 1983).

In *Berry*, the Fifth Circuit listed a series of factors for district courts to consider when determining whether a set of purportedly violative acts are related to the extent that they constitute a continuing violation, or whether the acts are discrete and individual violations:

> *The first is subject matter.* Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? *The second is frequency.* Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? *The third factor*, perhaps of most importance, *is degree of permanence.* Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? As noted, the particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula. We feel, however, that consideration of the above factors will generally be appropriate....

*Berry*, 715 F.2d at 981-82 (emphasis supplied). The Eleventh Circuit has subsequently applied the *Berry* analysis with approval. *See, e.g., Roberts*, 835 F.2d at 800-01.

Applying the *Berry* analysis to plaintiff's claims, the first inquiry is whether the timely-filed acts are of the same subject matter as the acts complained of outside the 180-day administrative

---

[109]The *Roberts* Court cited *Milton v. Weinburger* for the following proposition:

In *Milton*, the District of Columbia Circuit refused to apply the continuing violation doctrine to resurrect several otherwise time-barred claims in which an employer denied promotions allegedly on the basis of race when the plaintiffs failed to allege a nexus between the events. The court noted that to allow a more liberal application of the doctrine would provide an end-run around the policy underlying Title VII's 180-day filing requirement: Protecting employers from the burden of having to defend against claims arising out of remote managerial decisions.

*Roberts*, 835 F.3d at 800.

filing period. *See Berry*, 715 F.2d at 981-82. Here, the events complained of by plaintiff within the 180-day period  regarding arguments over job assignments and awards, as well as the overtime disputes, are of the same subject matter of plaintiff's complaints about actions occurring outside the 180-day period.

The second prong of the *Berry* test analyzes the frequency of the alleged acts. *See Berry*, 715 F.2d at 981-82. Plaintiff alleges overtime violations, being ordered to stop reading on the clock, and job choice and selection problems on a fairly regular basis, so the mere frequency of incidents appears to be present.

The third, and probably most important, inquiry of the *Berry* test, however, is the degree of permanence of the acts.   *See Berry*, 715 F.2d at 981-82.  In other words, one must determine whether each act is of such a nature that it would be apparent to the employee at the time that she should assert her rights. *See Berry*, 715 F.2d at 981-82. The acts that plaintiff complains of here are clearly of such a nature, as evidenced by her frequent and timely complaints to management. Thus, the court concludes that plaintiff was aware that she should assert her rights when the complained-of events occurred.   To allow plaintiff to assert the continuing violation doctrine under these circumstances, despite her apparent early knowledge of the nature of the acts occurring outside the 180-day window, would be contrary to binding precedent. The Eleventh Circuit has repeatedly held that "[t]he continuing violation doctrine is premised on the 'equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" *Hipp v. Liberty National Life Insurance Co.,* 252 F.3d 1208, 1222 (11th Cir. 2001) (*quoting Alldread v. City of Grenada,* 988 F.2d 1425, 1432 (5th Cir. 1993)) (internal quotation marks omitted). The *Hipp* opinion expands on this point

by holding that "[t]his circuit... [has] recognized this underlying premise in holding that "[a] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." *Hipp,* 252 F.3d at 1222 *quoting Roberts*, 850 F.2d at 1550). The purpose of the continuing violation doctrine is to permit a plaintiff to bring suit on acts whose violative nature was not apparent when they occurred. *See Hipp,* 252 F.3d at 1222 (*citing Doe v. R.R. Donnelly & Sons Co.,* 42 F.3d 439, 446 (7th Cir. 1994)). In the present case, it is evident that plaintiff was aware of Delphi's earlier alleged violations, as evidenced by her frequent complaints. Consequently, the continuing violation doctrine is not available to maintain the viability of plaintiff's claims occurring outside the 180-day filing window.

In summary, the continuing violation doctrine is not appropriately invoked by a plaintiff who has early knowledge of the allegedly discriminatory nature of the acts complained of. *See Hipp,* 252 F.2d at 1222. Accordingly, Plaintiff's Title VII claims based upon events occurring before August 5, 1999 are procedurally barred, and any Title VII claims arising from them are due to be dismissed.

        **ii.**       **Plaintiff's claims inside the 180-day administrative filing period**

        **(A)**       **Gender discrimination claims**

Plaintiff must rely upon the four incidents that allegedly occurred within the 180-day administrative filing period to support her gender discrimination claim: namely, (1) plaintiff learned in October, 1999 that co-employee Robert Anders previously had been awarded a "job setter" position desired by plaintiff because area manager Tommy Jones "held it open" for him;[110] (2) plaintiff was instructed by Mitchell on three occasions to stop reading "on the clock" (*i.e.*, when she

---

[110]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 92-93, 95.

was supposed to be working);[111] (3) plaintiff filed an overtime grievance on October 4, 1999;[112] and (4) plaintiff was assigned to "heat treat" duty on November 20, 1999.[113]

There is no direct evidence of a discriminatory intent on the part of Delphi.[114] Thus, plaintiff must rely upon circumstantial evidence to prove intentional discrimination. When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of gender discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. If a defendant carries its burden of producing "admissible

---

[111]It is unclear when these events occurred. Here the court gives the plaintiff the benefit of the doubt because this court holds that the plaintiff's being told not to read on the clock is not any kind of violative act, as discussed *infra*. *Id.* at 114-16.

[112]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 5.

[113]Delphi's evidentiary submissions, Exhibit A (Plaintiff's EEOC charge), at 59-60.

[114]Plaintiff's brief opposing Delphi's motion for summary judgment at 11.

-22-

evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id.* at 257, 101 S.Ct. at 1096, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S.Ct. at 1094-95 & n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106.

In order to set forth a prima facie case for disparate treatment gender discrimination, plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly-situated male employees more favorably; and (4) she was qualified to perform the duties of the job. *Cf., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002).

Being a female, plaintiff meets the first element.[115] *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination, this [element] requires a simple stipulation that the employee is a man or a woman."). As far as the third element is concerned, plaintiff makes a colorable argument, sufficient to survive summary judgment, that similarly-situated male employees were treated more favorably, based merely on the fact that the job position forming the basis of three of her four claims was awarded to a male. As a "floater," plaintiff also arguably meets the fourth element.

Plaintiff cannot satisfy the second element of a prima facie case, however, which requires her to demonstrate that she was subjected to an "adverse" employment action. An adverse employment action need not be an ultimate employment decision, such as termination. *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)). Even so, an employer's contested action must reach "some threshold level of substantiability." *Shannon,* 292 F.3d at 716 (*quoting Wideman,* 141 F.3d at 1456). "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII." *Shannon,* 292 F.3d at 716 (*quoting Bass v. Board of County Commissioners,* 256 F.3d 1095, 1118 (11th Cir. 2001). "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996).

Here, the denial of the "job setter" position cannot reasonably be construed as an adverse employment action because, by plaintiff's own admission, the individual who received the job

---

[115]Complaint ¶ 1.

(Anders) had more seniority.[116]  The plaintiff cites no authority for the proposition that it was somehow wrongful for her supervisor to give Anders notice of the opportunity, and encourage him to apply.  More importantly, plaintiff has set forth no evidence that the "job setter" position paid a higher wage than her then-current position.  The court has scoured the record for some indication of why the "job setter" position was preferable, and has found nothing aside from plaintiff's general assertions that she desired the position.  In the absence of evidence regarding the differences (if any) in compensation, terms, conditions, or other privileges between the job plaintiff then held and the "job setter position" she sought, plaintiff cannot establish that the denial of that position was an "adverse" employment action and, thus, she cannot establish her prima facie case.

This court also does not find plaintiff's October 4, 1999 overtime complaint to be an adverse employment action, because she was ultimately awarded compensation for the disputed overtime hours, despite the fact that she did not actually work those hours.[117]  Such a minor issue, especially where no evidence indicates a gender-based animus, cannot reasonably be cast as an event that alters an employee's compensation, terms, conditions, or privileges of employment.

The instruction to not read while "on the clock" similarly falls short of an adverse employment action, considering that, by plaintiff's own admission, she paid little (if any) attention to her supervisor's orders.[118]  Further, plaintiff concedes that all employees were given the same instruction.[119]  Finally, plaintiff was not disciplined, docked in pay, or otherwise punished for reading when she should have been working.[120]

---

[116]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 92-93.

[117]Delphi's evidentiary submissions, Exhibit G (Fuller declaration) ¶ 5.

[118]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 145-49.

[119]*Id.* at 148.

[120]*Id.* at 148-49.

Plaintiff's transfer to the "heat treat" station will not suffice as an adverse employment action, either.[121] This short, one-day reassignment of overtime duties, for the same pay, pursuant to the overtime equalization provisions set forth in the collective bargaining agreement,[122] does not rise to the level of an adverse employment action. *See Shannon v. Bellsouth Telecommunications, Inc.,* 292 F.3d 712, 716 (11th Cir. 2002) ("where reassignment involves no *'serious and material* change in the terms, conditions, or privileges of employment,' a court should not act as a 'super-personnel department' by questioning an employer's business judgment about where it assigns employees.") (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239, 1244 (11th Cir. 2001). Consequently, plaintiff cannot meet the second element required to set forth a *prima facie* claim for gender discrimination.

In summary, plaintiff cannot establish the second element of a prima facie gender discrimination claim, and summary judgment is due to be entered in favor of Delphi.

### (B)    Hostile work environment claims

The archetypal sexual harassment claim involves "a demand that a subordinate, usually a woman, grant sexual favors in order to obtain or retain a job benefit." Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 3-4 (1992) (footnote omitted); *see also, e.g., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). More broadly defined, however, it encompasses claims based upon a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

---

[121]*Id.* at 59-60.

[122]*Id.* at 63, 87.

*Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *see also, e.g.*, *Henson v. City of Dundee*, 682 F.2d 897, 901-02 (11th Cir. 1982). "A sexually hostile environment is 'sexual' not because it necessarily involves or invites sexual activity, but because the offensive conduct is motivated by the victim's sex. Thus, a hostile environment may or may not be expressed in sexual gestures, language, or activity." Lindemann & Kadue, *supra* at 8 (footnote omitted).

A plaintiff desiring to establish a hostile work environment claim must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon the plaintiff's sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of the plaintiff's employment; and (5) there is a basis for holding the employer responsible under either a theory of vicarious or direct liability. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982).

Here, plaintiff cannot meet the third and fourth elements.

Plaintiff has produced scant evidence that any of the "harassment" she complains of was based upon her gender. *See, e.g., Henson,* 682 F.2d at 904 ("In making a claim for hostile work environment . . . the plaintiff must show that but for the fact of her sex she would not have been the object of harassment."). This element enforces the familiar maxim that Title VII does not serve as

a "general civility code," and, consequently, plaintiff must prove that any alleged wrongdoing by defendant was motivated by her gender. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998); *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283, 141 L.Ed.2d at 662. When questioned, even plaintiff does not attempt to connect the acts she complains of to her gender, beyond the mere fact that she happens to be a woman. The following excerpts from her deposition are illustrative:

Q:    Well, do you think that you were asked not to read while you were on the job because of your sex?

A:    I think I was asked not to read to be harassed by Mitch because prior I had called for a committee man.

Q:    Because you had complained to the union?

A:    Yes, sir.[123]

. . . .

Q:    Did you ever tell anybody at Delphi that you thought that any of the treatment you were receiving was because of the fact that you're a female or because of sex discrimination?

A:    No, sir.

Q:    Did any other employees have problems with Dick Bremer?

A:    I would hear they had problems.

Q:    Male and female alike?

A:    Yes.

Q:    Do you think Mitch did anything else to you, other than ask you not to read, because you had contacted the committee man?

A:    We went in the office with his supervisors and mine, the union people,

---

[123]Delphi's evidentiary submissions, Exhibit A (Warner-Eno deposition), at 116.

because of the things he was continuing to do to me. And I felt because I was a strong willed woman and I wasn't going to take down [sic] and I — I'm a person that go [sic] by the book. I want you to go by the book. And he wasn't going to go by the book, and it constantly kept things going. He wasn't going by the book.

Q:    This —

A:    And I was strong enough to keep calling the committee man or do whatever I had to do to make sure he go [sic] by the book. And when you do that, that's a no-no. So you're going to get those retaliations. You're going to get them. I was a female, and I was out of my place like he told me. You're going to get it, those kind [sic] of retaliations. When you [sic] strong willed and you speak your opinion, you [sic] wrong.[124]

The fact that plaintiff was "a strong willed woman" does not alone establish that, "but for the fact of her sex she would not have been the object of harassment." *Henson*, 682 F.2d at 904. Indeed, plaintiff's testimony suggests that the alleged "harassment" and "retaliation" were precipitated by her "strong-willed" nature, rather than the fact that she is female.

Laying that supposition aside, however, it is clear that the trivial, infrequent events complained of by plaintiff fall *far* short of being either sufficiently severe or pervasive as to alter the terms, conditions, or privileges of her employment. Delphi acquiesced to almost every demand made by plaintiff: *e.g.*, she was not compelled to remove her filing cabinet/locker, even after being ordered to do so; she was not disciplined for repeatedly disobeying orders to stop reading when she should have been working; she was paid for overtime that she did not work; and, her request to be transferred to the day shift was granted. In fact, there are only two events occurring within the 180-day administrative filing period where Delphi did not *totally* accomodate plaintiff: (1) an employee with greater seniority was awarded the "job setter" position that plaintiff preferred; and (2) *on one occasion*, she was given the choice of working overtime at a "heat treat" station or going home.

---

[124]*Id.* at 131-33.

These innocuous events are neither sufficiently severe nor pervasive as to alter the terms, conditions, or privileges of plaintiff's employment. Thus, plaintiff cannot meet this element required to establish a hostile work environment, and her claim is due to be dismissed.

### (C)   Retaliation

Plaintiff claims that Delphi retaliated for her complaints to a union committeman about the decisions of her supervisors.[125] "Retaliation is a separate violation of Title VII." *Gupta*, 212 F.3d at 586. Section 704(a) of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)) provides protection for employees who complain or otherwise attempt to rectify an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).

In order to state a prima facie retaliation claim, plaintiff must establish three elements: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected activity and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d at 587; *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

---

[125]Complaint, at Count III.

In addition, when (as here) a plaintiff's retaliation claim is based upon conduct falling under the opposition clause of 42 U.S.C. § 2000e-3(a), the plaintiff must further demonstrate a good faith and reasonable basis for her belief that the conduct complained of constituted a violation of Title VII, as distinguished from proving that the employer actually engaged in an unlawful employment practice. *See, e.g., Gupta*, 212 F.3d at 586 ("To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed.") (quoting *Meeks*, 15 F.3d at 1021) (internal quotation marks omitted); *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989) ("[P]laintiff need only have had a 'reasonable belief' that an unlawful employment practice was occurring.").

For purposes of summary judgment, the court will assume that plaintiff subjectively possessed a good faith, reasonable basis for her complaints to her union committeeman and Delphi management. Even so, as discussed previously, none of the four acts about which plaintiff complains constitute "adverse" employment actions. Thus, plaintiff cannot set forth a *prima facie* claim for retaliation, and this claim accordingly is due to be dismissed.

## B.   Plaintiff's Claim Against UAW

Plaintiff's claim against UAW is derived solely from one incident: union committeeman Greg DeMike's refusal to file a paragraph 6(a) discrimination grievance on her behalf.[126] DeMike explains that he rejected plaintiff's request because his investigation revealed that the proper basis for plaintiff's claim was actually a paragraph 71 overtime grievance.[127] DeMike repeatedly pleaded with plaintiff to give him permission to file the paragraph 71 grievance.[128] Plaintiff refused, insisting

---

[126]Complaint, at Count II.

[127]UAW's evidentiary submissions, Exhibit B (DeMike deposition), at 113-15.

[128]*Id.*

that he file a paragraph 6(a) grievance on her behalf, or none at all.[129]  Plaintiff now sues, based upon UAW's refusal to file the paragraph 6(a) grievance, as she demanded.

A member's claim against her union for failure to file a grievance may be grounded upon: (1) the National Labor Relations Act, alleging the union's failure to adhere to its duty of fair representation; (2) Title VII, alleging some form of discriminatory animus affecting the way that the union represents its members; or (3) both.  To summarize:

> [i]t is perhaps elementary to suggest that the duty of fair representation is substantively different from the union's duty not to discriminate under Title VII.  The former is based upon notions of fairness inherent in the union's right to exclusive bargaining power and applies the *Vaca* standard;[130] the latter is based upon the express statutory language of Title VII in § 703(c) and (d).

2 Arthur Larson, *Employment Discrimination* § 37.05[2] (2d ed. 1998).

Here, plaintiff takes the Title VII tack.  Indeed, she characterizes her claim against UAW as one based upon "disparate treatment based on gender."[131]  Additionally, in her brief responding to UAW's motion for summary judgment, plaintiff's sole line of argument utilized a *McDonnell Douglas* analysis, and purported to establish a prima facie case of *employment* discrimination (which, incidentally, is not the proper test here).[132]

Plaintiff has produced no direct evidence of disparate treatment on the part of UAW, and thus must rely upon circumstantial evidence to prove her claim,[133] utilizing the *McDonnell Douglas* burden-shifting framework.

---

[129]*Id.*

[130]*Vaca* held that a union breaches its duty of fair representation only if such representation (or lack thereof) is arbitrary, discriminatory, or in bad faith.  *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).

[131]Complaint, at Count II.

[132]Plaintiff' brief opposing UAW's motion for summary judgment § II.

[133]*See generally* Plaintiff's brief opposing UAW's summary judgment motion.  Plaintiff does not even discuss direct evidence, but rather goes straight into a *McDonnell Douglas*-type burden-shifting analysis.

In order to establish a prima facie case of discrimination in UAW's processing of her grievance, plaintiff must set forth evidence from which a reasonable trier of fact could conclude that: (1) she was a member of a protected class; (2) she was qualified to have the union represent her in the grievance process; (3) that a grievance process existed; and (4) that similarly situated non-protected grievance filers were treated differently. *Thomas v. Rite Aid Corp.*, No. 93-1800, 1994 WL 597708, at *5 (E.D. Pa. Nov. 1, 1994). Here, plaintiff has produced no evidence to satisfy the fourth.

In her brief opposing UAW's motion for summary judgment, plaintiff makes only a cursory attempt to identify anyone similarly situated to her, addressing this prong with one sentence, stating that "[t]he Plaintiff adopts and incorporates by reference the argument from her brief in opposition to the Delphi motion for summary judgment."[134] Flipping over to plaintiff's brief opposing Delphi's motion for summary judgment, the court finds that, in this document, plaintiff limits her discussion of purportedly similarly-situated individuals to her claims against *Delphi*, totally omitting mention of any similarly-situated, non-protected, grievance filer who was treated differently.[135] The court further finds no mention of such a person in the rest of the record. Thus, the utter dearth of evidence necessary to establish this element prevents plaintiff from setting forth a prima facie case.

Plaintiff's complaint also throws in an allegation, contained within her "disparate treatment" count, that "UAW has been engaged in a pattern or practice of failing to pursue grievances regarding discrimination against Delphi, of which [Warner-] Eno is a victim."[136] The court finds that the only place that plaintiff produces any authority, evidence, or argument supporting this proposition is under plaintiff's discussion of "pretext," contained within her brief opposing UAW's motion for summary

---

[134]Plaintiff's brief opposing UAW's motion for summary judgment ¶ II(B)(1)(c).

[135]Plaintiff's brief opposing Delphi's motion for summary judgment ¶ II(B)(1)(c).

[136]Complaint ¶ 26.

need not reach the validity of plaintiff's pretext argument. Plaintiff's claim against UAW is therefore due to be dismissed.

## IV. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are due to be granted as to all of plaintiff's claims. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _____ day of September, 2002.

_____
United States District Judge